## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 25 2019, 10:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David L. Joley
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

S.C.,
*Appellant-Respondent,*

v.

State of Indiana,
*Appellee-Petitioner.*

July 25, 2019

Court of Appeals Case No.
18A-JV-3045

Appeal from the Allen Superior Court

The Honorable Andrea R. Trevino, Judge

The Honorable Carolyn S. Foley, Magistrate

Trial Court Cause No.
02D07-1808-JD-914

**Najam, Judge.**

# Statement of the Case

S.C. appeals the juvenile court's adjudication of him as a delinquent on one count of battery, as a Class B misdemeanor when committed by an adult, and the court's award of guardianship over him to the Department of Correction. S.C. raises three issues for our review, which we revise and restate as follows:

1. Whether the juvenile court abused its discretion when it admitted as evidence the victim's show-up identification of S.C.

2. Whether the juvenile court violated S.C.'s due process rights when it did not advise him of his of right to appeal the court's dispositional order.

3. Whether the juvenile court abused its discretion when it awarded guardianship over him to the Department of Correction.

We affirm.

# Facts and Procedural History

At approximately 9:30 p.m. on August 19, 2018, Timothy Oberley, Jr. was walking from his house to a gas station to get some snacks. While walking, Oberley observed four young black men, later identified as S.C., J.M, J.W., and T.H., walking toward him. Oberley noticed that S.C. was wearing a dark red t-shirt, that J.M. was wearing a blue "soccer style zip-up jacket," and that J.W. was wearing a tie-dyed shirt. Tr. Vol. II at 43. Oberley did not notice what T.H. was wearing. As Oberley walked by the group, J.M. made a comment to him. Oberley thought they were "just trying to start something," so he ignored

them and kept walking. *Id*. at 41. On his way home from the gas station, Oberley again saw the same four people. As Oberley walked by the group the second time, S.C. made a comment to him. Oberley again did not respond but kept walking. Oberley then noticed that the four individuals were following him.

[4] At one point, Oberley stopped walking, and he set his phone on the ground in order to light a cigarette. J.M. then grabbed Oberley's cell phone. Oberley asked for his phone back, but the group walked away. Oberley followed them down an alley. The individuals stopped walking, and Oberley again asked for his phone back. J.M. held the phone out for Oberley to take. But "right when [Oberley] went to grab it," J.M. "socked [him] in the face and dropped [him] to the ground." *Id*. at 42. At that point, S.C. and J.W. "joined in" and started hitting Oberley in the chest. *Id*. After Oberley heard one of the individuals suggest searching his pockets, he stood up, "pushed [his] way out," and made his way back to the gas station. *Id*. at 43. Oberley then borrowed a phone to call the police. The whole incident took "a minute or two." *Id*. at 46

[5] Officer Alvin Davis with the Fort Wayne Police Department ("FWPD") received a dispatch from 9-1-1 shortly after 9:30 p.m. Dispatch advised officers that there had been a report of a "strong armed robbery" and that the suspects were four black males. *Id*. at 8. Dispatch further advised officers that one suspect was in a red shirt, one was in a blue zip-up shirt, and one was in a tie-dyed shirt. Approximately ten minutes after he had received the dispatch, Officer Davis arrived at the scene, and he began to check the area for the

suspects. Officer Davis observed four individuals "matching the exact clothing descriptions" Oberley had given to the officers. *Id.* at 9. Officer Davis then detained the four males and informed other officers in the area that he had located possible suspects.

[6] Approximately twenty-three minutes after Oberley had called 9-1-1, FWPD Officer Brock Hassenzahl transported Oberley to the suspects' location in order to conduct a show-up identification. After they had arrived, Officer Hassenzahl parked his police car, illuminated his spotlight, and aimed it toward the sidewalk near where Officer Davis was standing with S.C., J.M., J.W., and T.H. Officer Hassenzhal then exited his vehicle, and Oberley remained inside. At that point, Officer Davis walked the subjects one at a time, unrestrained, to the illuminated portion of the sidewalk. After Officer Davis had walked each subject into the spotlight, Officer Hassenzahl asked Oberley if he recognized the individuals. Oberley was able to positively identify S.C., J.M, and J.W. Oberley was "completely certain" that those three individuals had attacked him. *Id.* at 53. However, even though "all signs pointed toward" the fourth individual having been involved, Oberley "couldn't identify him." *Id.*

[7] On September 4, the State filed a petition alleging that S.C. was a delinquent. In that report, the State asserted that S.C. had committed battery, as a Class B misdemeanor when committed by an adult. On October 26, the juvenile court held a hearing on the State's petition. During the hearing, the court admitted evidence of Oberley's show-up identification of S.C. over S.C.'s objection. The State also presented Oberley's testimony as evidence. During his testimony,

Oberley identified S.C. as one of the four individuals who had attacked him. Oberley was "[o]ne hundred percent certain" about his identification of S.C. *Id.* at 54. At the conclusion of the hearing, the juvenile court adjudicated S.C. a delinquent.

[8] The court then held a dispositional hearing on November 28. Prior to the start of the hearing, S.C. and his parents watched a video that informed S.C. of his rights. After S.C. and his parents stated that they had no questions regarding the video, the court proceeded with the hearing. At the beginning of the hearing, the juvenile court admitted as evidence S.C.'s predispositional report, a placement board staffing report, and a report from the Allen County Juvenile Center ("ACJC") where S.C. had been detained.

[9] The predispositional report outlined S.C.'s legal history, which includes eight prior delinquency referrals. As a result of previous referrals, S.C. served a term on probation in 2016, which term ended after S.C. had violated his dispositional order. Additionally, S.C. was placed in the ACJC from January 12, through March 17, 2017, when he was released to an electronic monitoring program. S.C. was in that program until June 7, when he absconded. Further, S.C. was incarcerated in the Department of Correction from July 24 through May 7, 2018. And S.C. was again placed in the ACJC from May 30 until July 24. The predispositional report also identified S.C. as having a high risk to reoffend. The report recommended that guardianship over S.C. be awarded to the Department of Correction so that he would have a "structured and supervised environment." *Id.* at 98.

[10]     The placement board staffing report indicated that S.C. had had his first delinquency referral at the age of twelve, he has had past unsuccessful terms on probation, he has problems with substance abuse, he is a "[d]anger to Self and/or Community," he continues to engage in risky or dangerous behaviors, he is physically aggressive, and he was on parole at the time of the current offense. *Id.* at 65. Based on those factors, a majority of the placement board recommended that guardianship over S.C. be awarded to the Department of Correction. Further, the ACJC report indicated that, between the dates of September 24 and November 15, 2018, S.C. received three disciplinary reports, including one for "riotous behavior." *Id.* at 68.

[11]     At the end of the hearing, the juvenile court stated:

> The Court does find that [S.C.], who is sixteen years of age, is before the Court on what is designated as case thirteen. This does appear to be his ninth delinquency referral before the Court. . . . So the Court does therefore find that [S.C.] does have an extensive history of delinquent behavior before the Court. I'll note that formal probation supervision began for him in August of 2016 and it looks like he has been the recipient of services fairly consistently since that point in time, although it looks like there's some . . . brief stoppages here and there, most notably in 2017 with absconding from the probation supervision, and it looks like that was for about a month and a half. I do find that [S.C.] has been given opportunities to alter his behaviors. He has been supervised at the formal level as well . . . , including the Electronic Monitoring Program. As, and as already noted, he does have a prior commitment to the Indiana Department of Correction[]. This report is pretty clear that [S.C.] remains in need of rehabilitation, does need to learn logical and natural consequences of his delinquent behavior. . . . I do find that

probation services have been exhausted. While I understand the recommendation for the defense as to placement, statutorily speaking, placement is not even on the table at this point. The Psychological Test Report did not recommend, placement board did not recommend, and as a result, I do not have discretion, as I, I think the defense is aware, to simply order placement, unless such placement is a private placement through the family. The Department of Child Services will not pay for placement unless it's been recommended by a mental health professional. So that is not an option. At this point, I don't see that we have any other options at this point in time.

Tr. Vol. IV at 17-18. Accordingly, the juvenile court found that "detention is essential to protect the child and community" and awarded guardianship over S.C. to the Department of Correction. Appellant's App. Vol. II at 102. This appeal ensued.

# Discussion and Decision

### *Issue One: Show-Up Identification*

[12]     S.C. first contends that the trial court abused its discretion when it admitted evidence of the show-up identification of him by Oberley. "[T]he admission of evidence is within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of that discretion." *Rasnick v. State*, 2 N.E.3d 17, 23 (Ind. Ct. App. 2013). "The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court misinterprets the law." *Id.*

[13]     On appeal, S.C. asserts that the trial court abused its discretion when it admitted evidence of the show-up identification because that identification was unduly suggestive. Specifically, S.C. contends that the show-up identification was unduly suggestive because "four young juveniles were one by one walked in front of the complaining party via a spotlight," and because the only description of him Oberley had given to the officers was of "a young black man wearing a reddish shirt." Appellant's Br. at 12, 14. And S.C. contends that the admission of that evidence violated his rights under the Fourteenth Amendment to the United States Constitution.

[14]     This Court previously addressed a similar argument in *N.W.W. v. State*, 878 N.E.2d 506 (Ind. Ct. App. 2007), *trans. denied*. In that case, N.W.W. robbed a female at gunpoint. The victim "got a good look at the face of the gunman[.]" *Id*. at 507. The gunman then fled, and the victim called the police. The police responded and located N.W.W. *Id*. at 508. The officers then brought the victim to N.W.W.'s location, and she positively identified him as the gunman. *Id*. Thereafter, the State filed a petition alleging that N.W.W. had committed robbery, as a Class B felony if committed by an adult. *Id*. At a hearing, the victim again "unequivocally identified N.W.W. as the person who had robbed her." *Id*. The trial court entered a true finding on the State's robbery allegation.

[15]     On appeal, N.W.W. "raised several arguments regarding the constitutionality of the of show-up identification." *Id*. at 509. However, this Court determined that it "need not address" N.W.W.'s arguments regarding the show-up identification because the victim had identified N.W.W. in open court as the

person who had robbed her. This court noted that, "'where a witness had an opportunity to observe the perpetrator during the crime, a basis for in-court identification exists, independent of the propriety of pre-trial identification.'" *Id.* (quoting *Adkins v. State*, 703 N.E.2d 182, 185 (Ind. Ct. App. 1998)). Because N.W.W. did not challenge the sufficiency of the basis for the victim's unequivocal in-court identification of him as the person who had robbed her, we held that the evidence regarding the show-up identification was merely cumulative of the in-court identification. *Id.* And the erroneous admission of evidence that is merely cumulative of other evidence in the record is not reversible error. *Id.*

[16] Here, we agree with the State that the trial court did not abuse its discretion when it admitted evidence of the show-up identification because that identification was not unduly suggestive. However, even if we assumed for the sake of argument that the show-up identification was improper, S.C. still cannot show that the court committed reversible error when it admitted that evidence. Oberley was able to observe S.C. as one of the four individuals who had attacked him in the alley. Then, at the fact-finding hearing on the State's petition, Oberley again identified S.C. as one of his attackers with "[o]ne hundred percent" certainty. Tr. Vol. II at 54. But S.C. does not challenge the sufficiency of the basis for Oberley's in-court identification of him. Accordingly, the show-up identification evidence was merely cumulative of Oberley's in-court identification of S.C. S.C. has therefore not shown that any

error in the admission of the show-up identification was reversible error. *See N.W.W.*, 878 N.E.2d at 509.

### *Issue Two: Due Process*

[17]   S.C. next contends that the juvenile court violated his due process rights. As our Supreme Court has stated, a "juvenile charged with delinquency is entitled to have the court apply those common law jurisprudential principles which experience and reason have shown are necessary to give the accused the essence of a fair trial." *In re K.G.*, 808 N.E.2d 631, 635 (Ind. 2004). As a general rule, the standard for determining what due process requires in a particular juvenile proceeding is "fundamental fairness." *D.M. v. State*, 108 N.E.3d 393, 395 (Ind. Ct. App. 2018). On appeal, S.C. specifically asserts that the juvenile court violated his due process rights when it did not advise him of his right to appeal the court's dispositional order.

[18]   However, while S.C. contends that the juvenile court failed to advise him of his right to appeal the dispositional order, S.C. has not presented any evidence to support that assertion. The record demonstrates that, prior to the start of the dispositional hearing, S.C. and his parents watched a video that advised S.C. of his rights. But S.C. has not provided a copy or a transcript of that video on appeal. Accordingly, we agree with the State that "it is possible that the video contained an advisement of S.C.'s appellate rights." Appellee's Br. at 10. In any event, even if the juvenile court did not advise S.C. of his right to appeal, S.C. has not demonstrated that he suffered any harm due to the alleged error as

he timely appealed the court's dispositional order. Therefore, S.C. has not met his burden on appeal to demonstrate any reversible error on this issue.

### Issue Three: Guardianship over S.C.

Finally, S.C. challenges the juvenile court's order that he be placed in the wardship of the Department of Correction. As the Indiana Supreme Court has explained:

> The specific disposition of a delinquent is within the juvenile court's discretion, to be guided by the following considerations: the safety of the community, the best interests of the child, the least restrictive alternative, family autonomy and life, freedom of the child, and the freedom and participation of the parent, guardian, or custodian. We reverse only for an abuse of discretion, namely a decision that is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.

*K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006) (citations and quotation marks omitted). S.C. asserts that the juvenile court abused its discretion when it awarded guardianship over him to the Department of Correction because there was a less restrictive option available, namely, a private facility. And S.C. contends that the only reason the juvenile court did not place him in a private facility was due to financial concerns, which he asserts "cannot be a means for a finding that is not the least restrictive setting for the child." Appellant's Br. at 18.

[20] But we cannot say that the juvenile court abused its discretion when it awarded guardianship over S.C. to the Department of Correction. At only sixteen years old, S.C. has already had many contacts with the juvenile court. Due to previous referrals, S.C. has been placed on probation, on electronic monitoring, in the ACJC, and in the Department of Correction. He has previously violated the terms of his probation, and he has absconded from electronic monitoring. But despite those previous attempts to correct his behavior, S.C. continues to commit delinquent acts. Indeed, S.C. committed the instant offense only four weeks after he had been released from the ACJC and while he was on parole for a prior offense. In addition, the placement board recommended that S.C. be placed in the Department of Correction because he is a danger to himself and his community. And, while awaiting his dispositional hearing for the instant offense at the ACJC, S.C. received several disciplinary referrals, including one for riotous behavior. We also note that the predispositional report assessed S.C. as having a high risk of reoffending. As such, we cannot say that the trial court abused its discretion when it determined that less-restrictive options than placement with the Department of Correction would not be successful.

[21] We acknowledge that one reason the juvenile court declined to place S.C. in a private facility was due to the financial restrictions of both the State and S.C. However, as discussed above, it is clear that that was not the only factor the court considered. Rather, the juvenile court considered S.C.'s history of delinquent behavior, the recommendation of the placement board, and the ACJC report, all of which indicated that S.C. continues to engage in delinquent

behavior despite previous attempts at probation, electronic monitoring, and a commitment to the Department of Correction. Based on all of those factors, the juvenile court concluded that the detention of S.C. "is essential to protect the child or community and is in the child's best interests." Appellant's. App. Vol. II at 102. Accordingly, the trial court did not abuse its discretion when it declined to place S.C. in a private facility and when it awarded guardianship over S.C. to the Department of Correction.

## Conclusion

[22] In sum, the trial court did not abuse its discretion when it admitted as evidence the show-up identification of S.C. because that evidence was cumulative of Oberley's in-court identification of S.C. Further, S.C. has not met his burden on appeal to demonstrate that the juvenile court violated S.C.'s right to due process. And the juvenile court did not abuse its discretion when it awarded guardianship over S.C. to the Department of Correction. Accordingly, we affirm the juvenile court's judgment.

[23] Affirmed.

Baker, J., and Robb, J., concur.